**Affirmed and Memorandum Opinion filed April 13, 2023.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-22-00271-CR

---

**JESSE CASTANEDA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 412th District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 77579-CR**

---

## M E M O R A N D U M   O P I N I O N

A jury found Appellant Jesse Castaneda guilty on two counts of indecency with a child by exposure and assessed punishment at four years' confinement. *See* Tex. Penal Code Ann. § 21.11(a)(2). On appeal, Appellant asserts that (1) the evidence is legally insufficient to support the jury's guilty findings, and (2) the trial court abused its discretion in limiting the testimony from Appellant's expert. For the reasons below, we affirm.

# BACKGROUND

Appellant was arrested in October 2015 and indicted on two counts of indecency with a child by exposure. Appellant proceeded to a jury trial in March 2022. We summarize as follows the relevant witness testimony from trial.

## *Complainant*

Complainant was 12 years old at the time of trial. She testified regarding an incident that occurred with Appellant in September 2015, when she was five years old. According to Complainant, at that time she, her two brothers, her mother ("Mother"), and Appellant lived together in their home. Complainant said the family shared a bed in the bedroom.

On the day in question, Complainant said she was sleeping and woke up to Appellant carrying her into the living room. Complainant recalled that Appellant laid her down on the sofa and "started like taking [her] clothes off," including her underwear. Complainant said Appellant also took his shirt off. Complainant said she was lying naked on her stomach when Appellant began "sitting on [her] back."

According to Complainant, Appellant remained sitting on her for "a couple minutes" before Mother came in the room. Complainant said Mother "started yelling at [Appellant] and then she grabbed me." Complainant recalled that Appellant and Mother were yelling at each other while Mother helped her put her clothes back on. Complainant also remembered Appellant putting his clothes on before "walking out the door."

Complainant said she "went to see the nurse" later that same day. Complainant said Appellant did not spend the night at the family's house after the incident.

### Officer Hill

Officer Hill was the second witness to testify at trial. According to Officer Hill, he was dispatched to an early-morning call at Mother's house on September 26, 2015. Officer Hill said he made contact with Mother and Complainant at 9:30 a.m. and learned that the incident with Appellant had occurred at approximately 7:00 a.m. Officer Hill said Mother told him what had occurred and explained that Appellant was Complainant's stepfather.

According to Officer Hill, Mother also gave him a clear Ziploc bag containing the clothes she put on Complainant after the incident with Appellant, specifically, a shirt and underwear.

Officer Hill said Appellant was not at the scene when he arrived. According to Officer Hill, he was told Appellant had gone to work. Officer Hill recalled that Mother took Complainant to Texas Children's Hospital for a sexual assault examination.

### Officer Morrison

On September 26, 2015, Officer Morrison was dispatched to the hospital to talk to Mother and Complainant about the reported incident with Appellant. Officer Morrison also contacted the Children's Advisory Center to schedule an interview for Complainant later that same day. Discussing Complainant's interview, Officer Morrison recalled that Complainant was "unable to put into words" what had happened with Appellant. However, Complainant was able to say that Appellant "had picked her up out of her bed from her mom and taken her to the couch. She talked about [how] her mom had come in screaming at him and that mom had called the cops." According to Officer Morrison, Complainant also used dolls to describe the incident and "used them to show that the boy doll was on

top of the girl doll."

Officer Morrison said the clothing Officer Hill collected from Mother was sent for DNA processing. Officer Morrison also said that Appellant consented to provide a DNA sample that also was sent for processing.

### Amanda Domer

Amanda Domer is a forensic scientist employed at the Texas Department of Public Safety Crime Lab in Houston. According to Domer, evidence from Appellant's case was submitted for screening in 2016 and tested in November 2017.

With respect to Complainant's clothing, Domer "perform[ed] a chemical test that can identify possible semen." Domer said a "strong positive" was identified on Complainant's shirt and a "weak positive" was identified on Complainant's underwear. Domer said these portions of Complainant's clothing were submitted for further DNA testing.

Domer also tested the samples collected during Complainant's sexual assault exam. Domer said semen was not detected on Complainant's vaginal or oral swabs.

### Jessica Ehmann

Jessica Ehmann is a supervisor in the DNA section of the Texas Department of Public Safety Crime Lab in Houston. According to Ehmann, her work includes "compar[ing] those DNA profiles from the evidence to DNA profiles from known individuals in a case."

With respect to the semen identified on Complainant's underwear, Ehmann testified that the "DNA profile is interpreted as originating from a single individual." According to Ehmann, the probability of obtaining this profile if the

DNA came from Appellant was 52.8 sextillion times more likely than the probability of obtaining the profile if the DNA came from an unrelated, unknown individual.

For the semen identified on Complainant's shirt, the DNA profile also was attributed to a single individual. Ehmann stated that obtaining this DNA profile is 876 septillion times more likely if the DNA came from Appellant than if the DNA came from an unknown, unrelated individual.

### Officer Cox

Officer Cox testified regarding the data recovered from Appellant's Apple iPhone. Officer Cox said Appellant voluntarily turned his phone over to law enforcement in October 2016, approximately one year after the underlying incident.

Officer Cox testified about two messages received on Appellant's phone from a number listed as a contact for Mother. In these messages, Mother purportedly admitted to setting Appellant up with respect to the charged offense.[1]

---

[1] The first message stated as follows:

It's me, [Mother], your soon to be ex-wife. I have to tell you something. I'm sorry for setting you up. I had to. I know you were probably going to try to take the kids from me. And you were right. I was going to leave your sorry ass when you bought that truck for me. I hate you so much and I want you to die. I haven't been happy in a long time. I have been thinking [of] ways to set you up so I've been a lot searching [sic]. So I came up with this plan. And they bought it. When you were getting ready for work I text my dad and told him. I tricked [Complainant] to think that you picked her up when I did. I took her underwear off. I made her think that you were on top of her. It was hard to trick a 5-year-old but she believed everything I told her. I told her if she didn't do what I told her she wouldn't go to school no more. So when you left for work at 7:30 I have already told my aunt and uncle. They told me to call the cops so I had to think fast so that's why [I] called them at 9:30. I didn't know this would have been all day. But all that was worth it. You will never see these kids and you will go to prison and I will be out and laughing at you. I have been talking to different guys. Also coming to [the] house while you are at work. I hate you, [Appellant]. I

5

These messages were sent in October 2015, shortly after the incident with Complainant occurred.

Officer Cox testified that these messages seemed inconsistent with other messages from Mother that were found on Appellant's phone and did not have the same "tone." According to Officer Cox, other messages from Mother were not of the same length nor did they begin with Mother "introduc[ing] herself" to Appellant. Officer Cox also stated that "the grammatical errors in these [two] messages are not consistent with other messages" from Mother. Officer Cox noted that there was "never any response" to these messages and agreed that it was "as if they were never acknowledged by anyone."

Continuing on, Officer Cox testified about the possibility of manipulating cell phone data, including text messages:

> Q. And is it — in your experience do you even necessarily need access to somebody's physical phone to be able to manipulate data?
>
> A. No.
>
> Q. Okay. And what are ways that you can do that without physically having the device?

---

always have. And the only reason I am texting you this is because I want to hurt [you] so bad. I can't believe you called the cops last year when I pushed you down the stairs. That's another reason I set you up. Because if you go to jail they drop the warrant. Don't worry about showing this text message because by [the] time you read your message your phone will be reset and turned off. I just want you to know why I did it. I lost my first two kids. I won't lose these kids. So [Appellant], again, I set your fucking ass up really good. Your very smart wife, [Mother]. You didn't think I could come up with this. I hope you die in prison before my uncle does. He want[s] to kill you. So does everyone else and [I] can't believe they let you out. But it's okay. You're going back because they will never believe you. They don't care how clean your background is. They are going to hang you. Just remember, I put you there, [Appellant].

The content of the second text message is substantially similar to the first message.

6

A.      One option that comes to mind easily would be with Apple devices specifically.  Apple has tried to get everything grouped together so with their iMessage utility you can have multiple Apple devices that can all receive the same text messages and things like that.  So if I have an iPad or a Mac computer as well as an iPhone, all those devices can be registered together and can receive and send text messages.

Q.      And with that said, can that make it difficult to determine who is sending what at times?

A.      Possibly, yes.

According to Officer Cox, Appellant's phone showed that it also had access to an email account belonging to Mother.  With respect to the two messages purportedly from Mother that took blame for setting up Appellant, Officer Cox agreed that there was "no way to tell" who authored them.

***Mother***

According to Mother, she was married to Appellant for five years and they have two children together.  Mother said she and Appellant divorced in 2017.

On the day in question, Mother recalled that she "was sleeping and [] heard moaning."  Mother said she "thought it was [Appellant] looking at porn" because he "tended to do that a lot."  Mother said she got out of the bed and "walked towards where [she] was hearing the sounds from."

Mother said she walked into the living room and saw Complainant on the sofa on her back, with Appellant on top of her "between her legs."  Mother said that both Complainant and Appellant were naked and recalled that Complainant looked scared.  When Appellant saw Mother, Mother said Appellant immediately got off Complainant and "said that he was sorry and it wouldn't happen again."  According to Mother, Appellant also "begged [her] not to call the police."

Mother said she helped Complainant put on her clothes, which were on the

7

floor near the sofa. Mother also recalled that Appellant left the home. Mother said she called the police and, when Officer Hill arrived, she gave him the clothes she had put on Complainant after the incident. When questioned further about Complainant's clothes, Mother said she used her bare hands to pick up the clothes and place them in a plastic bag. Mother said, after the incident, she took Complainant to the hospital for a medical exam and to the Children's Advisory Center for an interview.

Mother said she has not lived with Appellant since the incident occurred but acknowledged that she has stayed in contact with him about their sons. Mother said she did not send Appellant the two text messages that admitted to setting him up with respect to the charged offense.

### Dr. Spence

Appellant called Dr. Spence as an expert witness on forensic DNA analysis. During his testimony, Dr. Spence reiterated that Complainant's clothing was collected by Mother after the incident occurred. According to Dr. Spence, it was "concerning" that Mother collected the evidence with her bare hands because "[y]ou get your own DNA onto the items or you could potentially transfer your DNA or somebody else's DNA that's on your hands onto those items."

Dr. Spence also was concerned that Mother placed Complainant's clothing in a plastic bag. Dr. Spence testified that moisture in a plastic bag can cause the DNA on clothing to break down.

On cross-examination, Dr. Spence stated that he did not have any issues with the DNA analyses done on the evidence nor the "results [and] interpretations" that they yielded. Dr. Spence also testified that he had "no way of knowing" if the manner that the evidence was collected affected the results.

8

*Appellant*

At the time of the incident, Appellant said he lived at the house with Mother, their two sons, and Complainant. Appellant described the night before the incident as "normal." Appellant said he got home from work after 6:00 p.m. and "relaxed, took a shower, [and] watched a little bit of TV." Appellant said he and Mother stayed up after the children, went to bed, and had sex.

Appellant said he woke up the next morning at approximately 6:00 a.m., got ready for work, and left shortly after 7:00 a.m. Admitted into evidence was Appellant's time-card showing that he arrived at work at 8:15 a.m. Appellant said he worked the full day and went home at 5:00 p.m. Appellant recalled that Mother and the children arrived home after he did and described everything as "normal."

According to Appellant, later in the week Mother started acting "different" and Appellant suspected she was "back online dating again." Appellant said Mother told him there was a warrant out for his arrest and she moved out of the home. Appellant said he "had no idea what was going on." Several days later, Appellant voluntarily turned himself in at the police department.

Appellant said Mother sent him the text messages in which she admitted to setting him up regarding the incident with Complainant. Appellant acknowledged that it took him over a year from the date the messages were received to turn his phone over to law enforcement.

*Conclusion of Trial*

After the close of evidence, the jury deliberated and returned a verdict finding Appellant guilty of two counts of indecency with a child by exposure. *See* Tex. Penal Code Ann. § 21.11(a)(2). The jury assessed punishment at four years' confinement. Appellant timely appealed.

9

**ANALYSIS**

Appellant raises two issues on appeal and asserts:

1. the evidence is legally insufficient to support the jury's guilty findings; and
2. the trial court erred by limiting Dr. Spence's expert testimony.

We consider these issues separately, beginning with Appellant's evidentiary sufficiency challenge.

## I. Evidentiary Sufficiency

### A. Standard of Review and Governing Law

When reviewing the legal sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict and determine whether a rational factfinder could have found the elements of the offense beyond a reasonable doubt. *See Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). Although we consider all the evidence presented at trial, we do not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *Espino-Cruz v. State*, 586 S.W.3d 538, 543 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd). A factfinder may accept one version of the facts and reject another, and the factfinder may accept or reject any part of a witness's testimony. *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018). We defer to the factfinder's resolution of conflicts in the evidence, weighing of the testimony, and drawing of reasonable inferences from basic facts to ultimate facts. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

A person commits indecency with a child by exposure if, with intent to arouse or gratify the sexual desire of any person, he (1) exposes any part of his

genitals, knowing the child is present, or (2) causes the child to expose any part of the child's genitals. Tex. Penal Code Ann. § 21.11(a)(2). Here, the two counts submitted in the charge asked the jury to make separate findings for each of these two types of exposure. Because the jury returned a "guilty" finding on both counts, we consider the sufficiency of the evidence with respect to each type of exposure.

The term "expose" is not defined by statute, so we apply the term consistent with its general meaning. *See Warner v. State*, 257 S.W.3d 243, 246 (Tex. Crim. App. 2008) ("[A] term not defined by the legislature may be understood by its meaning in ordinary usage."); *see also Cantu v. State*, 604 S.W.3d 590, 593 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd). For purposes of this statute, courts have defined exposure to mean "'[t]o deprive of concealment; to disclose or unmask something criminal, shameful, or the like.'" *Cantu*, 604 S.W.3d at 593 (quoting *Balfour v. State*, 993 S.W.2d 765, 769 (Tex. App.—Austin 1999, pet. ref'd)).

This statute does not require the State to prove that the child complainant saw any part of the accused's genitals; rather, "the offense of indecency with a child by exposure is complete once the defendant unlawfully exposes himself in the required circumstances." *Harris v. State*, 359 S.W.3d 625, 631 (Tex. Crim. App. 2011). The child need only be in the accused's presence for the offense to be effectuated — the child does not have to be aware of the exposure. *Id*.

### B. Application

Here, legally sufficient evidence supports the jury's findings that Appellant, with intent to arouse or gratify the sexual desire of any person, (1) exposed any part of his genitals, knowing Complainant was present, or (2) caused Complainant to expose any part of her genitals. *See* Tex. Penal Code Ann. § 21.11(a)(2).

11

Complainant and Mother offered substantially similar testimony regarding the incident with Appellant. According to Complainant, she was sleeping when she awoke to Appellant carrying her into the living room. Complainant said Appellant removed her clothes, removed his shirt, and sat on her back while she was lying naked on the sofa. Mother testified that she walked into the living room and saw both Appellant and Complainant naked, with Complainant on her back and Appellant on top of her "between her legs." Mother also said she heard Appellant "moaning" before she walked in the living room and initially thought he was "looking at porn." Officer Morrison also said Complainant used dolls to describe the incident and put "the boy doll [] on top of the girl doll."

Appellant points out that Mother's and Complainant's testimony differed on one point: whether Complainant was on her back or on her stomach when Mother walked into the living room. But it was within the jury's province to resolve this conflict in the testimony. *See Isassi*, 330 S.W.3d at 638. Moreover, regardless of which version the jury believed, the remaining testimony is consistent on the facts necessary to support the jury's guilty findings.

Testifying about the DNA evidence collected in the case, Domer said semen was identified on Complainant's shirt and underwear — both of which were on the floor near the sofa during the incident with Appellant. With respect to the semen identified on Complainant's underwear, Ehmann testified that the probability of obtaining this particular profile if the DNA came from Appellant was 52.8 sextillion times more likely than the probability of obtaining the profile if the DNA came from an unrelated, unknown individual. For the semen identified on Complainant's shirt, Ehmann stated that obtaining this DNA profile is 876 septillion times more likely if the DNA came from Appellant than if the DNA came from an unknown, unrelated individual. This evidence, combined with the

12

other testimony (including Mother's testimony that Appellant was naked and on top of Complainant), supports the inference that Appellant exposed his genitals during the incident with Complainant.

Appellant testified that Mother set him up with respect to the charged offense and text messages were admitted into evidence to substantiate this allegation. But this evidence was not undisputed. Mother testified that she did not send the messages and Officer Cox testified that (1) the messages were not consistent with other messages from Mother, and (2) it was possible to manipulate cell phone data, including text messages. Considering this evidence as a whole, the jury reasonably could have concluded that Mother did not set Appellant up with respect to the incident with Complainant. *See Febus*, 542 S.W.3d at 572.

In sum, viewing all the evidence in the light most favorable to the jury's guilty findings, we conclude a rational factfinder could have found the elements of the offense beyond a reasonable doubt. *See Gear*, 340 S.W.3d at 746; *see also* Tex. Penal Code Ann. § 21.11(a)(2). We overrule Appellant's first issue.

## II.    Expert Testimony

In his second issue, Appellant asserts that the trial court erred in limiting the testimony of Dr. Spence, his expert witness on forensic DNA analysis.

### A.    Standard of Review and Governing Law

Texas Rule of Evidence 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue. Tex. R. Evid. 702. Accordingly, before admitting expert testimony under Rule 702, the trial court must be satisfied that three conditions

13

have been met: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the factfinder in deciding the case. *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006); *Dixon v. State*, 244 S.W.3d 472, 478 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). "The proponent of the expert testimony bears the burden of proving the expert's qualifications." *Dixon*, 244 S.W.3d at 478.

We employ an abuse of discretion standard in reviewing both the trial court's determination of a witness's qualifications as an expert and the trial court's decision to exclude expert testimony. *Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006); *Jacob v. State*, 587 S.W.3d 122, 132 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd). We will not disturb the trial court's ruling absent a clear abuse of discretion. *Ellison*, 201 S.W.3d at 723; *Jacob*, 587 S.W.3d at 132. "Under this standard, we must uphold the trial court's ruling if it falls within the zone of reasonable disagreement." *Jacob*, 587 S.W.3d at 132.

## B. Evidence

Outside of the jury's presence, the trial court permitted counsel to question Dr. Spence. On direct exam, Dr. Spence testified that he has a bachelor's and master's degree in microbiology. Dr. Spence said he earned a PhD in molecular biology and focused his post-doctoral work on DNA analysis. Dr. Spence said he intended to testify on issues related to the collection and handling of evidence, as well as "some issues with items that could have been collected and weren't collected."

On cross-examination, Dr. Spence agreed that his testimony "would revolve around how the crime scene or parties involved with this could have been

14

processed differently" by the police.  Specifically, Dr. Spence testified that police should have collected Appellant's underwear or a penile swab to test for evidence of Complainant's DNA.  In addition, Dr. Spence said police should have collected DNA samples from other places within the family's home.  Dr. Spence said this biological evidence should have been collected "very promptly" after officers responded to the scene.  According to Dr. Spence, by failing to collect this evidence the police left "a hole in the crime scene collection."

The State also elicited testimony from Dr. Spence regarding his qualifications to opine on the quality of evidence collection in the case.  Dr. Spence testified that:  (1) he has never been to or worked a crime scene; (2) in the past decade, he has not "communicated directly with anybody in law enforcement [on] how to process a crime scene"; (3) he is not a police officer; and (4) he has not taken any courses on crime scene investigation.

Following this testimony, the trial court ruled that Dr. Spence could testify on "DNA, the items that were actually collected, the DNA testings of those items, and the results of those items."  The trial court ruled that Dr. Spence could not testify on "what the police could have collected, if something was collected what it would have shown, and anything of that nature."  In sum, the trial court stated that Dr. Spence was not permitted to "testify as to what the police should have done."

## C.    Application

On appeal, Appellant contends that the trial court abused its discretion in limiting Dr. Spence's testimony.  We disagree.

As the testimony outlined above shows, Dr. Spence sought to testify on the quality of the evidence collected in the case and what else police could have done to secure additional biological evidence.  However, Dr. Spence did not have any

15

experience, education, or training with respect to crime scene investigation or police procedures for evidence collection. *See* Tex. R. Evid. 702. Accordingly, Appellant failed to meet his burden to establish Dr. Spence's qualifications with respect to the proffered testimony. *See Dixon*, 244 S.W.3d at 478. The trial court did not abuse its discretion in excluding Dr. Spence's testimony on this point. *See Ellison*, 201 S.W.3d at 723; *Jacob*, 587 S.W.3d at 132.

We overrule Appellant's second issue.

## CONCLUSION

We affirm the trial court's judgment.


/s/    Meagan Hassan
Justice


Panel consists of Justices Bourliot, Hassan, and Poissant.

Do Not Publish — Tex. R. App. P. 47.2(b).

16